FINLEN, APPELLANT, *v.* HEINZE ET AL., RESPONDENTS.

(No. 2,063.)

(Submitted November 17, 1904. Decided April 20, 1905.)

*Mines—Sale—Oral Option—Specific Performance—Law of the Case—Sufficiency of Evidence—Equity—Appeal—Review of Facts—Record—Trial on Counterclaim—Estoppel —Change of Venue—Transfer of Cause Between Departments—Continuance—Placing Witnesses Under the Rule— Amendment — Surprise — Impeaching Witness—Harmless Error—Mutuality—Exclusive Possession—Improvements— Tender—Pleading—Interest.*

Former Appeal—Law of the Case.
1. The decision of the supreme court on questions directly involved and considered on a former appeal is the law of the case on a second appeal.

Mines—Oral Agreement for Sale—Evidence—Sufficiency—Specific Performance.

2. Evidence on a counterclaim for specific performance *held* sufficient to show a complete oral agreement for sale of interests in a mine.

Supreme Court—Equity Cases—Review—Questions of Fact—Evidence.

3. Under Code of Civil Procedure, section 21, as amended by Act of 1903 (2d Extra. Session of 1903, page 7), authorizing the supreme court to review all questions of fact, in an equity case, arising on the evidence presented in the record, and determine the same, the appellant must show that the preponderance of the evidence is against the findings of the trial court before the supreme court will disturb such findings on the ground of insufficiency of the evidence.

District Courts—Specific Performance—Evidence.

4. The district court, in an action to enforce specific performance of an oral agreement for the sale of real property, should weigh the evidence adduced in the light of the circumstances surrounding the transaction, and particularly with reference to the reasonableness or unreasonableness of the respective statements made by the principal actors in the case.

Statutes—Constitutionality—Equity Cases—Review.

5. Section 21, Code of Civil Procedure, as amended by Act of 1903 (2d Extra. Session, page 7), requiring the supreme court to review in equity cases all questions of fact arising upon the record and determine the same, does not purport to impose on that court any additional original jurisdiction, and hence is not unconstitutional.

Ejectment—Trial on Counterclaim—Specific Performance—Mines.

6. Where plaintiff sues in ejectment for a mine, but trial is had only on the counterclaim for specific performance of plaintiff's contract to convey the mine to defendant, the answer thereto, and the reply to such answer, the answer to the complaint in ejectment, denying plaintiff's right in the property, is not properly before the court, and so cannot affect defendant's right to specific performance. ·

Mines—Specific Performance—Estoppel.

7. Defendant is not estopped to claim that he succeeded to plaintiff's interests in a mine by contract with plaintiff, by reason of having brought suit in plaintiff's name, after the date of the contract, to enjoin a third person from working the mine, this having been under an arrangement with plaintiff, and he not having been misled thereby.

Change of Venue—Disqualification of Judges.

8. Under Code of Civil Procedure, section 615, subdivision 4 (before amendment by Act of 1903), authorizing change of venue "when from any cause the judge is disqualified from acting," the ground for change must be one of the causes enumerated in section 180 of the same code, as disqualifying a judge to sit in an action.

District Courts—Transfer of Cause from One Department to Another— Rules.

9. The transfer of a cause from one department to another of a district court is controlled by the rules adopted by such court.

District Courts—Transfer of Cause Between Departments—Irregularity.

10. A party may not complain of irregularity in the transfer of a cause from one department to another of a district court, in the absence of a showing that he was prejudiced by the transfer.

Continuance—Party not Ready for Trial.

11. Error cannot be predicated on the overruling of plaintiff's objection to immediately proceeding to trial on the ground that he was not ready for trial, where there was no application for continuance,

and no showing why plaintiff could not try the case then as well as at any time.

Witnesses—Exclusion from Courtroom—District Courts—Discretion.

12. Under Code of Civil Procedure, section 3371, providing that if either party requires it, the judge may exclude from the courtroom any witness of the adverse party not under examination, the application to exclude is addressed to the sound legal discretion of the trial court, subject to review only for a manifest abuse of such discretion.

Amendment—Surprise—Variance—Former Appeal.

13. Plaintiff cannot claim to have been surprised by the amendment of the counterclaim to conform to the proof, which defendant was permitted to make after conclusion of his direct testimony, where the same variance existed on a former trial and was called to the attention of the parties in the opinion on appeal from the decree then rendered.

Impeaching Witness—District Judges—Corrupt Decision.

14. Plaintiff, for the purpose of affecting the credibility of defendant's witness, may show that he was the active agent in procuring a person to negotiate with the judge on a former trial of the cause for a corrupt decision in favor of defendant.

Impeaching Witness—Evidence—Exclusion—Harmless Error.

15. Error in excluding evidence tending to impeach a witness for the defendant, seeking to enforce specific performance of an oral agreement for the sale of mining property, is harmless where, excluding this testimony, there is a clear preponderance of the evidence in favor of the findings for defendant.

Specific Performance—Clear and Unambiguous Proof—Complete Agreement.

16. Where there is made out by clear and unambiguous proof a complete agreement for sale of a mine, with all the terms that the parties saw fit to incorporate in it, specific performance may be decreed, though other terms might properly have been incorporated in a contract respecting such a subject.

Specific Performance—Mutuality—Performance.

17. The defense of want of mutuality is not available to defeat specific performance of an oral, optional contract where the party holding the option and seeking its enforcement has performed all its terms required to be performed by him.

Mines—Specific Performance—Exclusive Possession—Acts Inconsistent with.

18. The fact that plaintiff's foreman visited the mine in controversy several times during defendant's possession, and at one time directed the attention of defendant's foreman to the condition of the shaft, is not inconsistent with defendant's exclusive possession of the property under an oral option for its purchase from plaintiff, so as to bar his right to specific performance.

Specific Performance—Improvements.

19. Plaintiff may not defeat specific performance of an oral agreement for the sale of a mine which he gave defendant, on the ground that the latter, after taking possession, had made but slight expenditures in improvements, where defendant cleaned out the mine—which had been practically abandoned—repaired and replaced mining apparatus, and ran drifts and cross-cuts, discovering bodies of valuable ore in a few weeks where plaintiff had spent a considerable fortune in unsuccessful attempts to find ore bodies in paying quantities.

*Specific Performance—Purchase Price—Tender—Pleading.*
> 20. The counterclaim for specific performance of an oral agreement for the sale of a mine, possession of which plaintiff seeks to recover, need not allege a tender of the purchase price where it appears that plaintiff has denied the contract, and that acceptance of a tender would be refused; but it is enough to allege that defendant has at all times been able, willing and ready to comply with all conditions of the contract, and binds himself to pay the purchase money if he be given a decree for specific performance.

*Specific Performance—Interest on Purchase Price.*
> 21. Where plaintiff gave defendant an option to buy a mine, but, before the payments agreed upon became due, denied the existence of the contract and sued to recover the property, he was not entitled (section 4280, Civil Code) to interest on the purchase money, on specific performance being decreed against him, for the reason that he himself prevented defendant from making the payments.

*Appeal from District Court, Silver Bow County; William Clancy, Judge.*

ACTION by Miles Finlen against F. Augustus Heinze and others. From an adverse decree on a counterclaim and from an order overruling his motion for a new trial, plaintiff appeals. Affirmed, Mr. Chief Justice Brantly dissenting.

*Mr. A. J. Shores, Mr. W. W. Dixon, Mr. C. F. Kelley* and *Messrs. Forbis & Evans,* for Appellant.

The facts are too indefinite to justify specific performance. In all cases of specific performance, the evidence must be clear, conclusive, and satisfactory. (22 Ency. of Pl. & Pr. 1075; *Boggs* v. *Bodkin,* 32 W. Va. 566, 9 S. E. 891; *Cutsinger* v. *Ballard,* 115 Ind. 93, 17 N. E. 206; *Purcell* v. *Miner,* 4 Wall. 513.) This rule is held to be applicable with especial force where, as here, the property is shown to be rising rapidly in value. (*De Sollar* v. *Hanscome,* 158 U. S. 216, 15 Sup. Ct. 816; see, also, *O'Connor* v. *Jackson,* 23 Wash. 224, 62 Pac. 761; *Rice* v. *Rigley,* 7 Idaho, 115, 61 Pac. 290-294; *Brown* v. *Brown,* 33 N. J. Eq. 650; *Senomes* v. *Worthington,* 38 Md. 318; *Vanwert* v. *Chidester,* 31 Mich. 208; *Banks* v. *Weaver* (N. J.), 48 Atl. 515.)

The contract cannot be specifically enforced for want of mutuality. (See brief on former appeal, 28 Mont. 554.)

No part performance of the contract has been shown. (See brief on former appeal, 28 Mont. 554.)

The defendant, having disputed plaintiff's rights, cannot have specific performance of the contract. (*Willison* v. *Watkins,* 3 Pet. 43; Bigelow on Estoppel, 547; *Fears* v. *Merrill,* 9 Ark. 559, 50 Am. Dec. 229; *Conrad* v. *Lindley,* 2 Cal. 174; *Hicks* v. *Lovell,* 64 Cal. 20, 49 Am. Rep. 679; 27 Pac. 942, *Kennedy* v. *Hazelton,* 128 U. S. 667, 9 Sup. Ct. 202.)

The defendant does not offer, in his bill to do equity, and the offer is an essential part of a bill for specific performance. (20 Ency. of Pl. & Pr. 458; 3 Pomeroy's Equity, 1408; *Wenham* v. *Switzer,* 59 Fed. 947.)

The court erred in transferring the cause to another department, and in not granting a change of venue. If Judge Harney was disqualified from sitting in the case, he was equally disqualified from selecting his successor. The law very wisely gives no judge the power to select the judge for a party, in a case where the judge is disqualified. (See *Krumdick* v. *Crump,* 98 Cal. 119, 32 Pac. 800; *Anaheim Water Co.* v. *Jumpa etc. W. Co.,* 128 Cal. 568, 61 Pac. 80.)

Error was committed by the court in refusing to exclude the witnesses of defendant not under examination from the courtroom during the taking of the testimony. (1 Greenleaf on Evidence, secs. 431, 432, note 1; 2 Phillips on Evidence, 395; *Southey* v. *Nash,* 7 Car. & P. 632; *Walker* v. *Commonwealth,* 8 Bush (Ky.), 84; *Salisbury* v. *Commonwealth,* 79 Ky. 425; *Johnson* v. *Clem,* 82 Ky. 84; *Rainwater* v. *Elmore,* 1 Heisk. (Tenn.) 363; *Watts* v. *Holland,* 56 Tex. 54.)

It was competent for the purpose of showing the credibility of the witness, MacGinniss, to ask him any question in an attempt to show his interest in the suit, and his bias in favor of, or prejudice against, either of the parties to the suit, and the court erred in excluding such testimony. (*Sweet* v. *Shumway,* 102 Mass. 369; *Day* v. *Shekney,* 14 Allen, 255; *Beck* v. *Hood,* 39 Atl. 842; *State* v. *Downs,* 91 Mo. 19, 3 S. W. 221;

*Bates* v. *Holladay,* 31 Mo. App. 169; *The Queen's Case,* 2 Brod. & B. 312, 6 E. C. L. 160; *Morgan* v. *Frees,* 15 Barb. (N. Y.) 352; *O'Connor* v. *National Ice Co.,* 56 N. Y. Sup. Ct. 410, 4 N. Y. Supp. 537; *Barkley* v. *Copeland,* 86 Cal. 487, 21 Pac. 1; *Williams* v. *Dickinson,* 28 Fla. 108, 9 South. 847; *Georgia R. R. etc.Co.* v. *Lybrend,* 99 Ga. 421, 27 S. E. 798; *Fuller* v. *Fuller,* 108 Ga. 256, 33 S. E. 865; *Alward* v. *Oaks,* 63 Minn. 190, 65 N. W. 270; *Missouri, K. & T. Ry. Co.* v. *Glamory,* 34 S. W. 361; *Lewis* v. *Steiger,* 68 Cal. 200, 8 Pac. 884; *Luhrs* v. *Kelly,* 67 Cal. 292, 7 Pac. 698.)

*Mr. John J. McHatton,* and *Mr. Chas. R. Leonard,* for Respondents.

This court will not enter upon a re-examination or rehearing of questions of fact and of law once decided. (*Daniels* v. *Insurance Co.,* 2 Mont. 500; *Palmer* v. *Murray,* 8 Mont. 174, 19 Pac. 553; *Kelley* v. *Cable Co.,* 8 Mont. 440, 20 Pac. 669; *Davenport* v. *Kleinschmidt,* 8 Mont. 467, 20 Pac. 823; *Maddox* v. *Teague,* 18 Mont. 512, 46 Pac. 535; *Priest* v. *Eide,* 19 Mont. 53, 47 Pac. 206, 958; *Murray* v.·*Polglase,* 23 Mont. 401, 59 Pac. 439; *Mahoney* v. *Butte Hardware Co.,* 27 Mont. 463, 71 Pac. 674; *Clary* v. *Hoagland,* 6 Cal. 685; *Leese* v. *Clark,* 20 Cal. 417; *Lassnig* v. *Paige,* 56 Cal. 139; *Sharon* v. *Sharon,* 79 Cal. 686, 21 Pac. 26, 131; *Benson* v. *Shotwell,* 103 Cal. 163, 37 Pac. 147; *Cowles* v. *Chicago etc. Ry. Co.* (Iowa), 88 N. W. 1072; *Chicago etc. R. Co.* v. *Yost,* 61 Neb. 530, 85 N. W. 561; *Teryll* v. *City of Fairbault,* 84 Minn. 341, 87 N. W. 917; *Armijo* v. *Mountain Elec. Co.* (N. Mex.), 67 Pac. 726; *City of Austin* v. *Bartholomew,* 107 Fed. 349; Elliott's Appellate Procedure, 578.)

Section 21 of the Code of Civil Procedure, as amended by section 1, Chapter I, Laws of Second Extraordinary Session of 1903, does not authorize a trial *de novo* in the supreme court. A true trial *de novo* must mean an opportunity to each of the parties to present all of the testimony which he desires and to have a ruling of the court thereon and a decision of the

entire case, as now the practice on appeal from justice courts to district courts. The Act in question does not even hint at any such purpose. The Constitution vests original jurisdiction in the district court. In the exercise of that jurisdiction, it tried the case. This court has no constitutional and, consequently, no original jurisdiction to try and determine the case. Its jurisdiction is appellate. The legislature could neither take from the district court its original jurisdiction nor confer it, or any part of it, on this court. It cannot increase the power or enlarge the scope of this court's authority or activity. The Constitution is the measure of its power. (*In re Weston,* 28 Mont. 207, 211, 72 Pac. 512.)

Neither can there be trial *de novo* here as defined by some courts on appeal in equity cases. This court being invested by the Constitution with appellate power only in a case of this kind, its review and determination of the case can extend no further, under the above or any Act of the legislative assembly, than the limits heretofore defined by the court in its decisions. When the Constitution was adopted, these decisions existed, as did the statutes and laws upon which they rest. It was in view of these laws and decisions that the appellate jurisdiction was conferred, and they mark its limitations. (*State* v. *Kennie,* 24 Mont. 45, 60 Pac. 589; *Finch* v. *Kent,* 24 Mont. 268, 279, 61 Pac. 653; *Montana Ore P. Co.* v. *B. & M. Co.,* 27 Mont. 288, 536, 70 Pac. 1114, 71 Pac. 1005.) The appellate jurisdiction of this court is defined and the extent to which review may be had announced in the following cases: *Bordeaux* v. *Bordeaux,* 26 Mont. 533, 69 Pac. 103; *In re Weston,* 28 Mont. 207, 72 Pac. 512; *Finlen* v. *Heinze,* 27 Mont. 107, 69 Pac. 829, 70 Pac. 517; *State* v. *District Court,* 24 Mont. 539, 63 Pac. 395. (See, also, *Klein* v. *Valerius,* 87 Wis. 54, 57 N. W. 1112, 22 L. R. A. 609; *Christensen* v. *Farmers' Assn.,* 5 N. D. 438, 67 N. W. 300, 32 L. R. A. 730.) As sustaining the rule announced by this court in *State* v. *District Court,* 24 Mont. 539, as well as the other decisions of this court upon the same question, we cite the following cases, from

other courts: *Allen* v. *Kent Circuit Judge,* 37 Mich. 474; *Ferris* v. *Higley,* 20 Wall. 375; *Hubbell* v. *McCourt,* 44 Wis. 584; *State* v. *Jones,* 22 Ark. 331; *Miller* v. *Wheeler,* 33 Neb. 765, 51 N. W. 137; *Crull* v. *Keener,* 17 Ill. 246; *Kirkham* v. *Moore,* 30 Ind. App. 549, 65 N. E. 1042; *Baird* v. *Hutchinson,* 179 Ill. 435, 53 N. E. 567; *Canby* v. *Hartzell,* 167 Ill. 628, 48 N. E. 687; *Foster* v. *State,* 41 Mo. 61; *Harzfeld* v. *Converse,* 105 Ill. 534; *People* v. *Rumsey,* 64 Ill. 44; *Warren* v. *Dennison,* 89 Tex. 557, 36 S. W. 404; *Callanan* v. *Judd,* 23 Wis. 343.

The supreme court will not decide the case on the weight of the evidence, as the trial court may do, but will only reverse the decision of the trial court when there is a clear preponderance of evidence against the decision of the court below. (*Randall* v. *Burk Township,* 4 S. D. 337, 57 N. W. 4.) Where the evidence fairly justifies either one of two inferences, the finding of the lower court will not be disturbed. (*Spuhr* v. *Kolb,* 111 Wis. 119, 86 N. W. 562.)

In Nebraska, under a statute requiring the supreme court to review the evidence on appeal, it is said that "the correct rule appears to be that if the verdict or finding is clearly wrong, it should be set aside; but, if we only doubt its correctness, it will not be disturbed; and that where the testimony is taken orally before the trial court, his rulings must be given weight." (*Faulkner* v. *Sims* (Neb.), 94 N. W. 113; *Springer* v. *Chicago etc. Co.,* 102 Ill. App. 294; *Christensen* v. *Farmers' etc. Assn.,* 5 N. D. 438, 67 N. W. 300, 32 L. R. A. 730; *Kirkham* v. *Moore,* 30 Ind. App. 549, 65 N. E. 1042; *Hardware Co.* v. *Gardner* (S. D.), 99 N. W. 1105; *Chantler* v. *Hubbell,* 34 Wash. 211, 75 Pac. 802; *Chapman* v. *McIlwrath,* 77 Mo. 38, 43, 46 Am. Rep. 1; *Smith* v. *Allen,* 86 Mo. 178, 189; *Boggess* v. *Boggess,* 127 Mo. 305, 29 S. W. 1018; *Reed* v. *Reed,* 114 Mass. 372.) The appellate court cannot pass upon the credibility of witnesses, and, consequently, cannot, where there is a conflict in the testimony, arrive at its own conclusions therefrom, but must take the findings of the trial court. (*Shekey*

v. *Eldredge,* 71 Wis. 538, 37 N. W. 820; *Cox* v. *Cox,* 91 Mo.
71, 3 S. W. 585; *Hyler* v. *Nolan,* 45 Mich. 357, 7 N. W. 910;
*Cochran* v. *Yoho,* 34 Wash. 238, 75 Pac. 815; *Chantler* v.
*Hubbell,* 34 Wash. 211, 75 Pac. 802; *Spuhr* v. *Kolb,* 111 Wis.
119, 86 N. W. 562; *Anderson* v. *Cook,* 25 Mont. 330, 64 Pac.
873, 65 Pac. 113.)     The practice prevailing in the federal
courts is illustrated in *The Gladestry,* 128 Fed. 591; *Lopez* v.
*Collier,* 129 Fed. 104; *Lilienthal* v. *McCormick,* 117 Fed. 58;
*Denver etc. Ry. Co.* v. *Ristine,* 77 Fed. 58; *Heinze* v. *Butte &
Boston etc. Co.,* 126 Fed. 1, 11; *Lansing* v. *Stanisics,* 94 Fed.
380; *Harding* v. *Hart,* 113 Fed. 304; *Big Creek etc. Co.* v.
*American etc. Co.,* 127 Fed. 625; *Crawford* v. *Neal,* 144 U.
S. 585, 12 Sup. Ct. 759; *Warren* v. *Keep,* 155 U. S. 265, 15
Sup. Ct. 83.

The matter of whether or not witnesses shall be excluded is
a matter of discretion with the trial court, and the exercise of
that discretion cannot be reviewed in this court.     (8 Ency. of
Pl. & Pr. 93; *Chester* v. *Bower,* 55 Cal. 46; *Gregory Dry
Goods Co.* v. *McMahon,* 61 Mo. App. 505; *Schneider* v. *Hass,*
14 Or. 177, 58 Am. Rep. 296.)

There was no error in sustaining the objection to the ques-
tion asked witness MacGinniss if he knew Ada Brackett. It
was within the discretion of the trial court to refuse such an
examination.     (*Storm* v. *United States,* 94 U. S. 76, 84, 85;
*Third Great Western Turnpike Road Co.* v. *Loomis,* 32 N. Y.
127, 88 Am. Dec. 311, and note; *Commonwealth* v. *Mason,*
105 Mass. 163; 29 Am. & Eng. Ency. of Law, 804, 806;
Wharton's Evidence, 3d ed., sec. 541; Rapalje on Witnesses,
sec. 197; Thompson on Trials, secs. 524, 525; *Commonwealth*
v. *Churchill,* 11 Met. (Mass.) 538, 45 Am. Dec. 229; *Muetze*
v. *Tuteur,* 77 Wis. 236, 20 Am. St. Rep. 115, 46 N. W. 123,
9 L. R. A. 86; *Pullen* v. *Pullen,* 43 N. J. Eq. 136, 139, 6 Atl.
887.)

### APPELLANT'S BRIEF IN REPLY.

The manifest purpose of the Act approved December 10,
1903, amending section 21 of the Code of Civil Procedure, re-

lating to the powers and duties of the supreme court, was, first (as conceded by counsel for respondent), to render unnecessary the specifications of particulars in which the evidence is alleged to be insufficient; and second, to require the court to determine all questions of fact arising in the evidence presented in the record, where upon the record it might appear to the court that there was no good cause for a new trial or the taking of further evidence in the court below. As to the second requirement, the Act does not impose a duty or confer or invoke a power not ordinarily and usually incident to the exercise of appellate jurisdiction in equity. If the Act is invalid in this respect, it can only be because the appellate jurisdiction of this court conferred by the Constitution is less extensive than the words "appellate jurisdiction" import in their generally accepted and historic meaning.

It seems to have been well settled as a rule of practice and procedure in the territorial supreme court, that in any case where there was a substantial conflict of evidence, whether at law or in equity, and whether tried by a jury or not, the verdict or findings below would not be disturbed. But this rule of practice was never in any opinion of the territorial supreme court referred to any lack of jurisdiction in that court to determine the facts upon the evidence, except in actions strictly at law which had been tried by a jury. Whether its appellate jurisdiction in chancery differed from its appellate jurisdiction at law with respect to a review of the evidence or a determination of the facts therefrom, is a question that apparently never received consideration, and, so far as we have been able to discover, was never even raised.

The scope of the appellate jurisdiction of the territorial supreme court, however, is set at rest by the decision of the United States supreme court in *Stringfellow* v. *Cain,* 99 U. S. 610, which cause was remanded to the supreme court of Utah with the following instruction, among others: "To review the case upon the evidence sent up from the district court in respect to the claims of Jennings and Young as against the

corporate authorities of Salt Lake City and decide according to the justice of the case."

The court should follow the statute, notwithstanding its previous practice. The practice of refusing to review the evidence or to determine the facts in an equitable case is a mere self-imposed restraint upon the exercise of the jurisdiction conferred upon this court by the Constitution, resting upon considerations of practical weight. There would seem to be no good reason for holding that the legislature may not, by express enactment, abrogate this rule of procedure affecting the exercise of appellate jurisdiction by this court, if the legislature may, by express statute, destroy the conditions and rules under which courts of equity have from time immemorial declined to exercise their inherent equitable jurisdiction. Indeed, a legislative change in the Practice Act, requiring all evidence in equity cases to be submitted in writing instead of being produced orally, would undoubtedly be a valid Act, and would furnish a sufficient basis and probably lead to a change of the rule under which this supreme court has heretofore acted in declining to review the evidence and determine the facts upon appeal in equity cases, because the reasoning and the basis of such rule would be gone. (See *Christiensen* v. *Farmers' Warehouse Assn.,* 5 N. D. 438, 67 N. W. 300, 32 L. R. A. 730; *Klein* v. *Valerius,* 87 Wis. 54, 57 N. W. 1112; Elliott on Appellate Procedure, sec. 16; Curtis on Jurisdiction, p. 61; *Ex parte Ellis,* 12 Ark. 101; Ency. of Pl. & Pr. 402; *Sherwood* v. *Sherwood,* 44 Iowa, 192; *Preston* v. *Daniels,* 2 Greene (Iowa), 537; *Snyder* v. *Wright,* 13 Wis. 771; *Sanford* v. *McCreedy,* 28 Wis. 101; *Swift et al.* v. *Agnes et al.,* 33 Wis. 228; *Paige* v. *McMillan,* 41 Wis. 342; *Roberts* v. *Washington Nat. Bank,* 11 Wash. 550, 40 Pac. 225; *Nessley* v. *Ladd,* 29 Or. 354, 45 Pac. 904.)

We think our Act of 1903 is valid; and we think it the duty of this court to examine the evidence contained in the record and find the fact in accordance with its own view as to the weight of evidence, resorting to the findings below in aid of

conclusions to be reached only where the evidence is in apparent equilibrium and this court unable to determine where the preponderance lies. In such a case as the one now before the court, where the rule of decision requires that the evidence shall more than preponderate in favor of the plaintiff's claim, and that it shall be clear, unambiguous and convincing, the facts should be found by this court against the plaintiff if the record does no more than to present a mere preponderance in his favor.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

Upon the former appeal in this case (*Finlen* v. *Heinze,* 28 Mont. 548, 73 Pac. 123) a sufficiently explicit statement of facts was made, to which reference is now had, and a repetition of the whole avoided. It will be sufficient in this instance to say that in 1898 plaintiff, Finlen, held certain leases and bonds upon the interests of John Devlin, Mrs. Devlin, Mrs. Reilly, and Mrs. Kelly in the Minnie Healy lode mining claim, and had options to purchase those interests at any time on or before February 3, 1900, upon the payment of $100,000; that in December, 1898, F. Augustus Heinze, hereafter referred to as defendant Heinze, entered into possession of the property, claiming that by oral agreement made on November 21, 1898, Finlen had transferred his leases, bonds, and options to defendant Heinze, and had agreed to execute a writing evidencing such transfer. In February, 1899, Finlen made an unsuccessful effort to recover possession of the property, and in June following commenced this action in ejectment. To the complaint filed, defendant Heinze interposed an answer, and, by way of an equitable counterclaim, pleaded the agreement of November 21st, alleged a breach by Finlen, and asked that specific performance be decreed. To this counterclaim Finlen filed an answer, and to this answer defendant Heinze replied; and upon such counterclaim, answer, and reply the equitable portion of this action was tried, a decision rendered, and de-

cree entered in favor of defendant Heinze, but on appeal to this court that decree was set aside and a new trial ordered.

On July 29, 1903, the *remittitur* from this court was filed in the district court, and on August 10th counsel for the defendant Heinze moved the court to advance the cause and set it for trial. This motion was granted, and the cause set for September 16th. Plaintiff objected to the cause being set for trial, and moved the court to change the venue, on the ground that Judge Harney, who had presided at the former trial, was disqualified from again trying the same. On September 12th this motion was denied, and the cause was thereupon transferred to department No. 2 of the same court, presided over by Judge Clancy. On September 16th Judge Clancy proceeded to trial, whereupon plaintiff objected to its trial in department No. 2 on the ground of lack of jurisdiction, and objected to the hearing at that time for the reason that plaintiff was not ready for trial. These objections were overruled, and the trial proceeded upon the counterclaim of the defendant Heinze, the answer of plaintiff, Finlen, thereto, and the reply of Heinze to this answer, the defendant Heinze assuming the affirmative of the issue. After the direct testimony in behalf of defendant Heinze was concluded, he was permitted, over the objection of plaintiff, to amend his counterclaim. The court found the issues in favor of defendant Heinze, and entered a decree in his favor, from which decree, and an order overruling plaintiff's motion for a new trial, these appeals are prosecuted.

Some of the errors specified by the appellant were directly involved upon the former appeal, and were there considered and determined. The decision of this court in that instance became the law of this case as to all such questions. (*Murray* v. *Polglase,* 23 Mont. 401, 59 Pac. 439, and cases cited; *Mahoney* v. *Butte Hardware Co.,* 27 Mont. 463, 71 Pac. 674.)

1. It is contended that "the facts do not sustain the findings." We assume that what is meant by this is, that the evidence is insufficient to sustain the findings of the court.

It is claimed on the part of the defendant Heinze that prior
to November 21, 1898, plaintiff, Finlen, had been negotiating
for the sale of his interests in the Minnie Healy mining claim,
represented by leases and bonds upon and options to purchase
the interests owned by John Devlin, Mrs. Devlin, Mrs. Reilly,
and Mrs. Kelly; that Finlen had expended at least $54,000 in
a fruitless endeavor to make a mine of the property; that he
had taken out the tracks, air pipes, and other mining appli-
ances, and had suffered waste and debris to accumulate in the
different levels; that there was no ore of any commercial value
in sight; that for a year or more prior thereto the only mining
done by Finlen in this claim was development work to ascer-
tain whether or not the Boston and Montana Company was
trespassing upon and taking ores from a vein which Finlen had
been informed apexed in the Minnie Healy claim; that up to
this time the ore taken from this entire claim never paid ex-
penses; and that Finlen was anxious to dispose of his interest
in the claim.    These are facts with reference to which there is
not any material conflict in the evidence.

On the part of defendant Heinze it is further claimed that
prior to November 21st Finlen and John MacGinniss, Heinze's
agent, had been negotiating for an assignment by Finlen to
Heinze of Finlen's leases and bonds or options on the property,
and that these negotiations had progressed so far that Mac-
Ginniss had given to Heinze's counsel, McHatton, memoranda
of an agreement for the assignment of Finlen's leases and
bonds on the property, and that McHatton had drawn up two
writings embodying a contract conformable to MacGinniss'
ideas of the agreement he had made with Finlen; that on the
afternoon of November 21, 1898, Finlen went to McHatton's
office, where these writings were presented to him; that Finlen
objected to and refused to sign them; that at McHatton's sug-
gestion they went to see MacGinniss at his office with the
Montana Ore Purchasing Company; that there they met Mac-
Ginniss, the defendant Heinze, and his brother Arthur P.
Heinze, and for some time discussed the proposed transfer;

that at that meeting Finlen and defendant Heinze came to an agreement by which Finlen assigned his leases and bonds to Heinze by oral agreement that Heinze should, as soon as he elected, go into actual possession of the claim, work the same, keep the leases and bonds alive, and, if the property developed so as to justify Heinze, in his estimation, in taking up the leases and bonds from the Devlins, Reilly, and Kelly, he should thereupon pay plaintiff $54,000 in two equal installments ($27,000 one year after he should take up the leases and bonds, and $27,000 two years thereafter), these payments to be made without interest; that, as a part of this contract, Finlen agreed to commence an action against the Boston and Montana Company, and seek an injunction to prevent that company from taking ore from the vein claimed to apex in the Minnie Healy ground, and from which it was claimed the Boston and Montana Company was taking ore through workings in the Piccolo and Gambetta claims; that this action was to be brought and prosecuted at Heinze's expense, and the proceeds, if any, realized, should belong to Heinze; that, pending the commencement of this action, Finlen should retain possession of the Minnie Healy claim; that McHatton should act as Finlen's counsel, and commence the action as soon thereafter as the papers could be prepared; that Heinze insisted that this agreement should be reduced to writing and signed by Finlen and himself at once; that, owing to Finlen's desire to leave Butte for the East on the evening of this conversation, he (Finlen) declined to wait for the writing to be prepared, and stated, in effect: "You take hold of the property at any time you want to. It is yours now. I have transferred all my right and title to it. * * * We understand each other thoroughly. There is nothing here which we have not agreed upon, and you can absolutely depend upon my signing the papers which Judge McHatton will get out. My word is as good as my bond, and I shall be back here before the 1st of January, and I will sign the papers as soon as I get back. In the meantime you can take possession of the property at any time you want to. I

have transferred my entire interest in it to you, and you can go ahead and do what work you want to." And to Judge McHatton he said: "Well, Judge, you go ahead and bring this suit, and draw up an agreement which will outline the different terms and conditions of our understanding, and as soon as I get back from the East I will sign the agreement." That, relying on this agreement, and the representation of Finlen that he would, on his return to Butte, execute a writing which would evidence the assignment of his leases and bonds, Heinze went into possession of the property on December 23d, and thereafter had exclusive possession of the same, and by the expenditure of large sums of money so far developed the property as to disclose large bodies of valuable ore, thereby greatly increasing the value of the property to such an extent as to justify Heinze in taking up the leases and bonds; that Finlen knew of this work, and at least tacitly approved it; that, soon after the disclosure of these valuable ore bodies, Finlen repudiated the agreement, and notified Heinze's attorney and agent that he (Finlen) would not sign the written assignments, and that he declared the deal off. The terms of this agreement are testified to by defendant Heinze, Arthur P. Heinze, John MacGinniss, and Judge McHatton, the four persons who were present with Finlen when the agreement is alleged to have been made, and the other facts detailed above are sworn to positively by one or more of these witnesses.

Finlen positively denies that any complete agreement was entered into, and states that the principal subject of the conversation on November 21st was the suit against the Boston and Montana Company, and that he (Finlen) gave Heinze permission to go into the possession of the property for the purpose of doing development work with reference to the subject matter of this suit. The facts remain, however, that Finlen admits that he went to McHatton's office on the afternoon of November 21st; (he says he went there to see about the suit, but admits that while there nothing whatever was said about the suit, but that McHatton presented to him drafts of an

agreement for an option upon his interest in the Minnie Healy claim. When asked why he did not then retire, his answer is, "Because I was a sucker"); that upon his refusal to sign these drafts, and at McHatton's suggestion, he voluntarily went with McHatton to MacGinniss' office; that he there met MacGinniss and the two Heinzes, and talked with them and McHatton over the facts relative to the commencement of the suit against the Boston and Montana Company, as well as the transfer of his options to Heinze; that the sum of $54,000 was mentioned as the amount he should receive in case Heinze took up the leases and bonds, the payment of which was to be made in two installments, of $27,000 each, one and two years, respectively, after Heinze should take up the leases and bonds; that McHatton should draw up a written contract, and on his return from the East he was to sign it, if satisfied. When asked what McHatton was to incorporate in this writing, Finlen says, "I don't know." He admits also that he agreed that a suit for Heinze's benefit should be brought in his (Finlen's) name against the Boston and Montana Company to restrain that company from extracting ore from the vein supposed to apex within the Minnie Healy ground; that Heinze's leading counsel, McHatton, should act as attorney for him (Finlen) in this suit, and that Finlen's confidential man and agent, Wishon, should verify the complaint; and that in this conversation he did make use of the expression, "My word is as good as my bond."

While it is conceded that McHatton was to draw up a written contract for Finlen's signature, it appears that he neglected to do so, and upon the cross-examination of Finlen this testimony appears: "Q. In this conversation on the 21st of November, 1898, you said your word was as good as your bond? A. And I say it right now. If you had carried out your contract, I would have carried mine out." This answer appears to have been directed to Judge McHatton, who was conducting the cross-examination, who then asked Finlen this question: "Q. What was my contract that I failed to carry out? A. Your contract was to have the agreement drawn out by the time I

got back from the East, and I was to sign it and turn the property over; and, if you had done it, I don't suppose there would be any lawsuit to-day." In view of this admission, it seems impossible that no contract whatever was entered into on November 21st. It is, however, perfectly apparent that no contract was entered into at that time, if we accept Finlen's idea of a contract as a correct one. Upon his cross-examination he says: "I did not think I could go in and talk to a half dozen people, and they take my rights away by my talking to them, unless they had something to show for it, or I received something for it or some showing. Q. Didn't you understand that the terms of an agreement could be arrived at without a writing? A. No, sir; I didn't, where you take a man's property away from him." From this it is apparent that Finlen confuses a contract with the writing which evidences such contract.

The district court had a right, and it was its duty, to weigh the evidence in the light of the surrounding circumstances, and particularly with reference to the reasonableness or unreasonableness of the respective stories told by the principal actors in the case. Finlen's version is that the only agreement actually entered into on November 21st was that a suit should be commenced by Finlen, in Finlen's name, against the Boston and Montana Company, for the use and benefit of Heinze; that the proceeds, if any, from the suit, should go to Heinze; that the purpose of the suit was to make it appear that Finlen was in litigation with the Boston and Montana people, and to that extent, at least, occupying a friendly position toward Heinze, who was involved in considerable litigation with that company; that he gave Heinze permission to go into the Minnie Healy claim and do an amount of development work unlimited, so far as this record shows, or at least left entirely to the caprice of Heinze, and yet all to be done at Finlen's expense. The result is that Finlen lent his name, his property and resources, and his influence in the community to Heinze, who, according to that version, had no interest whatever in the Minnie Healy property, merely for the purpose of enabling Heinze to harass

the Boston and Montana Company with litigation in which Finlen could in no manner be profited; but, in the work done by Heinze in his attempt by development to demonstrate that the suit could be successfully maintained, Finlen might be financially ruined, and likely to be, if Heinze's mining operations in the property proved as barren of results as Finlen's had theretofore been. This version is hardly consonant with good business sagacity or a high sense of self-respect.

Furthermore, Finlen's contention that the expense incurred by these men employed by Heinze in the Minnie Healy mine after December 23d was properly charged to him (Finlen) seems inconsistent with Wishon's statement that Finlen told him afterward to make out a bill to Heinze for this expense, and collect the same. Heinze's version is that the agreement of November 21st for the sale of Finlen's interests to Heinze was completed, and that under that agreement he put his men to work, and the expense incurred was to be his expense. As many other men do who take leases upon mining ground, he was expending his money with a chance of losing it, or of discovering ore of sufficient value to make the investment a profitable one.

As tending to corroborate the testimony of Heinze, his brother, MacGinniss, and McHatton, it is conceded that an action was commenced in the name of Miles Finlen (this appellant) against the Boston and Montana Company with reference to this particular vein heretofore alluded to; that such action was commenced on December 5, 1898; that Wishon verified the complaint; and that McHatton acted as counsel for the plaintiff in that action. It is further a conceded fact that on December 23d Heinze's employees went to work in the Minnie Healy claim, McFarlane acting as superintendent, and Mahoney as foreman; that all the men employed therein or discharged therefrom were employed or discharged by Mahoney; and that this character of work continued until about February 24, 1899, when Finlen attempted to gain control of the property, and for that matter until this action was commenced in

June, 1899, when an injunction was issued which stopped operations.

John Devlin, one of the owners of the Minnie Healy claim, who had given Finlen an option on his interest (an option which it is claimed by Heinze was assigned to him by the oral agreement of November 21st), testified that in November, 1898, before Finlen went East, he (Finlen) told Devlin that he did not intend to do any more work on the Minnie Healy, and that he intended to turn the property over to Heinze.

John Telling, a miner, who had had some dealings with Finlen with reference to this mining claim, by which Finlen had become indebted to him, testified that he saw Finlen with reference to his matter in December, 1898, upon Finlen's return from the East, and in a conversation he asked Finlen, "How is the Minnie Healy looking?" that Finlen replied, "I don't know how it is looking. I have turned it over to another party"; that Telling asked, "Who is the party that you turned it over to?" and Finlen replied, "Mr. Heinze and company"; that Telling asked, "What about our agreement?" and Finlen replied, "Well, if I make my money out of it, what I have invested in it—that is, $54,000—I will pay you according to our agreement."

John Hoy testified that between November 15 and 22, 1898, Finlen told him that he had turned the Minnie Healy over to Heinze, and in the following January, in Helena, repeated the same declaration.

Hugh I. Wilson, who in 1898 was a tenant of Finlen, testified that in the fall of 1898 Finlen told him that he did not think that he would ever make a mine out of the Minnie Healy claim, and in November of that year told Wilson that he had disposed of the property to Heinze.

Heinze's employees McFarlane and Mahoney were given possession of the mine by Cook, who was Finlen's watchman at the mine; and Cook testified that Finlen told him in the fall of 1898 that, if Heinze came to look at the Minnie Healy

claim, for Cook to show him through, and, if he came to take charge of it, to turn it over to him; and Cook testified that, acting under this instruction, he did turn the property over to Heinze's employees on December 23d.

Wishon, who was Finlen's agent and foreman at another mine, testified that in November, 1898, Finlen told him he thought Heinze would take hold of the Minnie Healy, and for Wishon to give him possession if he came for it; that, acting under this instruction, he (Wishon) instructed Cook accordingly.

A witness (O'Neill) testified that he was working for Finlen in the Minnie Healy claim in the fall of 1898; that at the time the shaft was in bad condition, and he spoke to Finlen with reference to repairing it; that Finlen said to him: "Get along the best way you can. I expect to transfer the property at any minute to Mr. Heinze."

It is contended by appellant that certain circumstances tend to support Finlen's version, and to contradict Heinze and his witnesses. For instance, some of the men employed and bills for some of the materials used in this mine from December 23d to February 15th were paid by Finlen; that the first ore shipment made after December 23d was smelted at the Montana Ore Purchasing Company's smelter, of which Heinze was general manager; that an ore statement of the same was made out to Finlen, and a check for the net value of such shipment, amounting to $294, was executed and delivered by the smelter company to Finlen, though it was never presented for payment or paid; that some of the men employed at the mine from and after December 23d were men who had formerly worked for Finlen in this same mine; and that finally Heinze's witnesses have, on different hearings of this cause, testified to contradictory statements of fact.

The explanations tendered for these matters are: MacGinniss, who was Heinze's agent, and acting for him, testified that, some time after Heinze commenced work on December 23d,

one of the men who had ceased to work there presented his time check to the Hennessy Mercantile Company for payment; that Wishon, Finlen's agent, came to see MacGinniss about it, and it was then agreed between these two agents that the men and bills for supplies should be paid by Finlen through the Hennessy Mercantile Company, through which medium Finlen had formerly paid his employees, and that Finlen should bill on Heinze for these amounts; that this was done for convenience. Wishon also testified to the same thing, and these facts are not disputed.

Wishon also testified that he reported this agreement to Finlen upon his return from the East, and that Finlen approved it, and at one time thereafter directed Wishon to make out a bill on Heinze for the amount then due, and get the money; that he (Wishon) did commence to make out such bill, but through his own negligence it was not completed at the time this controversy arose. The clerk or bookkeeper at the Montana Ore Purchasing Company smelter testified that he made out the ore statement to Finlen, presumably under the instruction of some one there—possibly MacGinniss—but he is unable to remember definitely.

MacGinniss, who made out the check to Finlen for this ore shipment, testified that he knew that, under the arrangement which he had with Wishon, Heinze was then indebted to Finlen for more than the amount of the ore shipment on account of payments made to men and for supplies, and that he sent Finlen this check as a part payment on that account.

With reference to the re-employment of the men who had formerly been employed by Finlen at the Minnie Healy mine, Heinze, MacGinniss and McHatton testified that, in the conversation of November 21st, Finlen asked Heinze to employ Cook, who was then employed by Finlen as watchman at the Minnie Healy, and that Heinze agreed to do so. It appears that, at the suggestion of McFarlane, Cook was employed by Mahoney as a shift boss.

Mahoney testified that, as soon as it was known that the Minnie Healy was being operated again, men, some of whom had formerly worked there, applied for work, and were given employment. So far as this record discloses, only a very few of these men so employed had ever worked for Finlen.

Particular stress is laid upon the fact that, at the former trial of this cause, defendant Heinze testified respecting the agreement of November 21, 1898, that the payment to Finlen of $54,000 was to be made in two equal installments—$27,000 one year after the expiration of the leases and bonds, (which was February 3, 1900), and $27,000 two years after the expiration of the leases and bonds. In his counterclaim he alleges that these payments were to be made one and two years, respectively, after he should have taken up the bonds from the Devlins, Reilly and Kelly, and received deeds for the property, and upon this trial he testified according to the allegations of the counterclaim. In explanation of this apparent contradiction, defendant Heinze testified that he told Finlen that, if he should take up the leases and bonds, he would, in all probability, not do so until the date of their expiration, as that was his custom respecting such matters, and so thoroughly was he imbued with this idea that upon the former trial of this cause he made use of the terms "due date of the bonds" and "date of his taking them up" interchangeably, and as meaning precisely the same thing.

Other instances of like apparent contradictions are called to our attention, and it is incumbent upon us to say what, if any, importance we shall attach to the fact that the district court, which had the witnesses present in court before it, observed their demeanor while testifying, and could determine from their manner their apparent fairness or lack of fairness, after consideration of all the evidence found the issues in favor of defendant Heinze.

In *Bordeaux* v. *Bordeaux,* 32 Mont. 159, 80 Pac. 6, decided March 13th, this court gave attention to section 21 of the Code

of Civil Procedure, as amended by an Act of the Second Extra-
ordinary Session of the Eighth Legislative Assembly, approved
December 10, 1903, and among other things said: "This court
has power, and it is its duty, so far as it may, exercising a due
regard for the findings of the district court, based, as they are,
upon the testimony of witnesses delivered *ore tenus* in the pres-
ence of the court, to reach its own conclusions, and to declare
upon the rights involved accordingly. Owing to the advan-
tageous position of the trial court, due to the conditions just
adverted to, this court will naturally hesitate to overturn find-
ings based upon substantially conflicting evidence which would
justify an inference in favor of either side of the controversy."
This conclusion was reached after many cases involving stat-
utes or constitutional provisions similar to our section 21 as
amended were examined. The case of *Randall* v. *Burk Town-
ship,* 4 S. D. 337, 57 N. W. 4, was cited with approval, and
the following language from the opinion in that case was quoted
and adopted: "This court will not decide the case upon the
weight of evidence, as a trial court may do, but will only re-
verse the decision of the trial court where there is a clear pre-
ponderance of evidence against the decision of the court be-
low. The presumption is in favor of the decision of the trial
court upon the weight of evidence, which this court will respect,
and therefore it is only when this court finds there is a clear
preponderance of evidence against such a decision that the pre-
sumption above stated will be overcome. It becomes our duty,
therefore, not only to determine if there is a substantial con-
flict in the evidence, but to determine the case upon the weight
of evidence, having the above qualification in view."

In *Hardware Co.* v. *Gardner* (S. D.), 99 N. W. 1105, the
doctrine announced in the *Randall Case* above, is reaffirmed, and
it is there said: "The findings of the trial court are presump-
tively correct, and it is only when this court is satisfied that
there is a clear preponderance of the evidence against such find-
ings that such presumption will be overcome, and the decision
of the trial court reversed. (*Randall* v. *Burk Township,* 4 S.

D. 337, 57 N. W. 4.) Notwithstanding there is a conflict in the evidence in this case, we are not satisfied that the same preponderates against the findings, or that the conclusions of law are not fully supported by the findings."

In Wisconsin, under a statute similar to our own, substantially the same rule is adopted as that announced in the South Dakota cases. In *Spuhr ·v. Kolb,* 111 Wis. 119, 86 N. W. 562, it is said: "A careful examination of the evidence shows that, if the witnesses are believed, their testimony overwhelmingly sustains the findings of the court. There are suspicious circumstances and contradictions in the evidence, which might justify a trial court in discrediting those witnesses, but the situation so arising is one upon which the trial court has peculiar advantages for reaching a correct conclusion. The manner and appearance of the witnesses in the explanation of such discrepancies is of very great value. The case therefore especially invites the application of the rule that, upon evidence fairly justifying either of two inferences, the decision of the trial court must control."

In Washington the same result is reached. In *Roberts* v. *Washington Nat. Bank,* 11 Wash. 550, 40 Pac. 225, it is said: "In determining the facts established by the proofs the findings of the trial court should receive consideration, but cannot be allowed to control when, in the opinion of this court, they are contradicted by a clear preponderance of the evidence." (See, also, *Chantler v. Hubbell,* 34 Wash. 211, 75 Pac. 802.)

In Utah, under a constitutional provision similar to our Code, section 21, above, as amended, a rule similar to that prevailing in South Dakota has been adopted. In *McKay* v. *Farr,* 15 Utah, 261, 49 Pac. 649, it is said: "While we have power, under the Constitution, to review questions of fact in an equity case, still, when such cases have been regularly tried before a court of chancery, and facts found on all material issues, we will not disturb such findings unless they are so manifestly erroneous as to demonstrate some oversight or mistake which

materially affects the substantial rights of the appellant. This is the settled rule in this state."

In *Whittaker* v. *Ferguson,* 16 Utah, 240, 51 Pac. 980, the same court held that, under the constitutional provision above referred to, the supreme court has power in equity cases to go behind the findings and decree of the trial court, consider all the evidence, and decide on which side the preponderance thereof is. In *Elliot* v. *Whitmore,* 23 Utah, 342, 90 Am. St. Rep. 700, 65 Pac. 70, the decisions in the two former cases are reaffirmed.

The same rule seems to prevail in the federal courts. In *Lopez* v. *Collier,* 129 Fed. 104, 63 C. C. A. 606, it is said: "The case presents simple questions of fact. The evidence is conflicting. Several witnesses testified for libelant, and proved up his case. They were contradicted by several witnesses produced by defendant to prove up his case. The testimony was all taken in presence of the trial judge, who thus had an opportunity to see the witnesses and observe their demeanor while testifying; and, on the evidence, we are not able to say that he reached an erroneous conclusion."

In *Crawford* v. *Neal,* 144 U. S. 585, 12 Sup. Ct. 759, 36 L. Ed. 552, the same rule is announced as follows: "The cause was referred to a master to take testimony therein, 'and to report to this court his findings of fact and his conclusions of law thereon.' This he did, and the court, after a review of the evidence, concurred in his findings and conclusions. Clearly, then, they are to be taken as presumptively correct, and unless some obvious error has intervened in the application of the law, or some serious or important mistake has been made in the consideration of the evidence, the decree should be permitted to stand."

To the same effect is the decision in *Warren* v. *Keep,* 155 U. S. 265, 15 Sup. Ct. 83, 39 L. Ed. 144, where it is said: "There was a considerable amount of this evidence, and it was to some extent conflicting. The master acted in view of this

evidence, and the court below concurred in his finding, except in some unimportant particulars. As no obvious error or mistake has been pointed out to us, their conclusion must be permitted to stand."

It is true that a different rule is promulgated by some of the courts. For instance, in Oregon it is said that the decision of the lower court will only be consulted for the purpose of resolving a doubt which may arise from the conflicting and contradictory nature of the evidence. (*Nessley* v. *Ladd,* 29 Ore. 354, 45 Pac. 904, and cases cited.) But we prefer to adopt the other view, and hold that it is incumbent upon the appellant to show that the preponderance of the evidence is against the findings of the trial court, before we will disturb such findings upon the ground of insufficiency of the evidence.

Some contention was made upon the hearing that section 21, as amended, is unconstitutional. But we are not impressed with the argument offered. In fact, under the construction which we have given to the statute above, the objections to the validity of the Act are largely obviated. The Act does not purport to impose upon this court any additional original jurisdiction. It does not require us to try the cause *de novo* in this court, in the sense in which a trial anew is generally used, or in which it is used in section 1761 of the Code of Civil Procedure, when applied to appeals from justice courts to the district courts. No new pleadings can be filed in this court; neither can any new evidence be received. The Act only requires us to *review* the facts as presented in the record, and under like statutory provisions it is quite generally held that the appellate court can either render a judgment itself, or direct what proper judgment shall be entered in the trial court.

Considering this rule of construction announced above, and the fact that the trial court had the witnesses in this case before it, and further considering that the testimony of Finlen given on cross-examination is equivocal and evasive in many instances, and that he stands squarely contradicted by a large

number of witnesses, we prefer to adopt the language of the supreme court of South Dakota, above, and say: "Notwithstanding there is a conflict in the evidence in this case, we are not satisfied that the same preponderates against the findings."

Some contention is made that, while the evidence shows that at the conversation on November 21st reference was made to the payment of supplies then in the mine, and of men then engaged as watchmen about it, the finding of the court is that this was not a part of the agreement with reference to which specific performance is now sought, but a separate and independent transaction. An examination of the record discloses that this finding of the court is made upon testimony given directly to that effect—testimony not denied, except in so far as Finlen's general denial of any agreement having been made may be considered a denial. Under the rule just announced, this contention is not well made.

2. It is said that defendant Heinze, having disputed plaintiff's right in the property, cannot have specific performance of the contract. But counsel for plaintiff are mistaken in the facts. There is no such denial in any of the pleadings upon which this cause was tried. It appears that such denial is embraced in Heinze's answer to the plaintiff's complaint in the ejectment action, but that answer is not properly before us on this appeal. As we have heretofore said, the only pleadings properly before the court below and before this court are Heinze's counterclaim, Finlen's amended answer thereto, and Heinze's reply to this answer.

3. It is contended that by commencing an action in Finlen's name against the Boston and Montana Company, or suffering it to be done, Heinze thereby estopped himself to claim that he succeeded to Finlen's interests on November 21st. If an estoppel at all, it would be an estoppel *in pais,* with reference to which it is said in 11 American and English Encyclopedia of Law, second edition, 421: "The most usual application of the doctrine of estoppel *in pais* arises from the misrepresentation

or concealment of material facts on the part of the person to be estopped. Thus, it is a well-settled rule of equity, which has been adopted by the courts of law, that where A has, by his acts or representations, or by his silence when he ought to speak out, intentionally or through culpable negligence induced B to believe certain facts to exist, and B has rightfully acted on this belief, so that he will be prejudiced if A is permitted to deny the existence of such facts, A is conclusively estopped to interpose a denial thereof." While the fact of the commencement of this suit in Finlen's name might be invoked as a circumstance tending to disprove Heinze's contention, it is apparent, when tested by the rule announced above, that it falls far short of working an estoppel.

4. Error is assigned to the refusal of the district court to change the venue, and to its transferring the cause for trial to Department No. 2, presided over by Judge Clancy. It is not easy to determine from the motion for change of venue just what the particular grounds thereof are. Objection is made to Judge Harney making any order in the cause or trying the same "for the reason that said judge is disqualified from acting in said cause, for the reason and on the grounds contained and set forth in the opinion of the supreme court of the state of Montana rendered in said cause. * * * The plaintiff therefore moves that this cause be transferred to the proper county," etc. This motion was made at a time prior to the Second Extraordinary Session of the Eighth Legislative Assembly, which amended sections 180 and 615 of the Code of Civil Procedure, and the statute in force respecting a change of the place of trial at that time was section 615, above, before it was amended. Four separate grounds are stated in that section, but it is apparent that this motion could not have been based upon any one of them, unless it was subdivision 4, which provides for a change of the place of trial "when from any cause the judge is disqualified from acting." At that time the disqualifications of a judge to sit or act in an action or proceeding were enumerated in section 180 of the same Code,

and, whatever may be said of the strictures made by this court on the conduct of Judge Harney upon the former trial of this cause, they do not disclose a disqualification, within the meaning of this section. The motion was therefore properly denied.

The objection made to the trial of the cause before Judge Clancy was upon the ground of "lack of jurisdiction, owing to its [said cause] having been transferred to said Department 2 irregularly." It is not contended that the district court of the second judicial district of the state of Montana did not have jurisdiction of this cause. So far as the transfer of the cause from one department to another is concerned, that is a matter controlled by the rules adopted by the several departments of that court for their own convenience. Furthermore there is no showing made of any prejudice to this plaintiff in the transfer of this cause to Department No. 2 for trial.

5. Likewise the contention that the court erred in proceeding to trial on September 16th is without merit. There was no application for a continuance, and no showing made why the plaintiff could not and did not try the case at that time as well as he ever could have done.

6. At the commencement of the trial the plaintiff moved the court to exclude the witnesses. This motion was denied, and error is predicated upon this ruling. Section 3371 of the Code of Civil Procedure provides: "If either party requires it, the judge may exclude from the courtroom any witness of the adverse party, not at the time under examination, so that he may not hear the testimony of other witnesses." This statutory provision exists in many of the states, and it is quite uniformly held that the meaning of such a provision is that the application is addressed to the sound legal discretion of the trial court, and that no review will be had, except for a manifest abuse of such discretion. (Abbott's Trial Briefs, Civil Jury Trials, 133, and cases cited.) In the absence of any showing of prejudice, the action of the trial court will not be disturbed.

7. Upon the former appeal in this case this court held that there was a material variance between the pleading—counter-

claim—and the proof and decree, in that the bringing of the suit by Finlen against the Boston and Montana Company appeared from the proof, and was found by the court to have been, a material part of the contract of November 21, 1898, although there was not any allegation in the counterclaim respecting it. After the direct testimony on behalf of defendant Heinze was concluded, the court gave him permission to amend his counterclaim in this regard, and to make other slight amendments. As the matter of the bringing of this suit was testified to and found by the court on the former trial, and the variance was called to the attention of all the parties in the opinion rendered by this court, certainly plaintiff could not plead that he was taken by surprise by the amendment, or that he suffered prejudice by the amendment having been made. We are unable to see wherein the other amendments allowed were of any consequence or could have prejudiced the plaintiff.

8. Numerous errors are assigned upon the rulings of the trial court in receiving and excluding evidence. We have examined these, and, without reviewing them in detail, think no prejudicial error was committed. Special attention may properly be given to one of these assignments. Upon the cross-examination of John MacGinniss, a witness for the defendant Heinze, he was asked if he knew one Ada H. Brackett. An objection to this question was sustained, whereupon counsel for the plaintiff made the following offer of proof: "The purpose is, and I expect to show, if I am allowed to get answers to the questions, that the Ada Brackett referred to in the question was employed by John MacGinniss, in behalf of Mr. Heinze and the Montana Ore Purchasing Company, ostensibly as a stenographer, but really for the purpose of intimately associating with Judge Harney, one of the judges of this court, who tried this cause formerly, as an agent in behalf of F. Augustus Heinze to negotiate for a corrupt decision in this cause, and that she so served the defendant F. Augustus Heinze, with the result that a decision of that character was procured, and that

John MacGinniss, this witness, was the active agent of that operation." An objection to this offer on the ground that it was irrelevant, immaterial, and incompetent, and appeared to be made not in good faith, was sustained, and exception taken. This action of the court was erroneous. In *Beck* v. *Hood,* 185 Pa. St. 32, 39 Atl. 842, *Lewis* v. *Steiger,* 68 Cal. 200, 8 Pac. 884, and *Georgia R. & Banking Co.* v. *Lybrend,* 99 Ga. 421, 27 S. E. 798, the authorities in support of the proposition that this character of examination may properly be indulged in are collated. The authorities seem to be quite uniform. The purpose of the examination is to show the hostility of the witness toward the party against whom he testifies, or his zeal in behalf of the party for whom he is called as a witness.

But does this error necessitate a reversal? If the evidence excluded was substantive evidence which tended to support the plaintiff's theory of this case, or to destroy the theory of the defendant Heinze, then this court would be compelled to order a new trial. But the only purpose of this character of evidence was to affect the credibility of the witness, and, assuming that evidence tending to prove the facts set forth in the offer had been presented to the court, or assuming the most extreme view, that the witness MacGinniss had waived his constitutional privilege and had admitted the facts set forth in the offer, the utmost then that could have been asked of the trial court would have been that it disregard the evidence given by the witness MacGinniss in so far as the same is not corroborated by other credible evidence. An examination of the record will show that all of the testimony given by the witness Mac-Ginniss touching any material matters connected with this suit is corroborated by the testimony of other witnesses, who, so far as this record shows, are entitled to credence. But we may go further than this, and say that, if we disregard all the testimony given by the witness MacGinniss and hold it for naught, there is still a clear preponderance of the evidence in favor of the findings of the trial court—such a preponderance that, if the district court had disregarded MacGinniss' testi-

mony and had found in accordance with Finlen's idea of this case, this court would be justified in reversing such decision upon the ground that the clear preponderance of the evidence is against such a decision.

9. Again, it is contended that the contract, if proved, is so incomplete that specific performance will not be enforced; and numerous details of a contract such as appellant seems to think this should have been, in order to render it valid, are suggested as having been omitted.  We recognize the rule to be as stated by Mr. Justice Story in *Smith* v. *Burnham,* 3 Sum. 435, Fed. Cas. No. 13,019, as follows: "It is a general rule not to interfere to direct specific performance of any agreement where the terms of the contract are not all definite and full, and in its nature and extent are not made out by clear and unambiguous proof."  But what terms are to be made out by clear and unambiguous proof?  The particular terms which the parties to the contract saw fit to incorporate in it, or all the terms which an astute lawyer might incorporate in a contract respecting the same subject?  Clearly the former, and not the latter, and the mere fact that Heinze and Finlen did not decide upon or even discuss many matters which might properly have been considered and agreed upon by them will not prevent a court of equity from decreeing specific performance of the particular contract with respect to matters upon which they did agree, if such matters make up a complete agreement, with respect to which specific performance can be had.  If Heinze and his witnesses are to be believed, then a complete agreement was entered into, and the fact that such an agreement was made and its particular terms are shown by clear and convincing proofs.

10. It is said that there is no mutuality in the contract of November 21st, and that specific performance will not be enforced, and section 4412 of the Civil Code is cited in support of this contention.  It is, however, conceded by appellant's counsel that a strictly optional contract may be enforced in equity by the holder of the option in the same manner that

other contracts are. Finlen had leases and bonds upon the Devlin, Reilly, and Kelly interests—interests which he had a right to purchase. These leases and bonds extended for more than one year after November 21, 1898. Finlen had an interest in real estate which he could convey, and such conveyance could have been effected by an assignment of his leases and bonds or by a deed or otherwise.

Furthermore, it appears that defendant Heinze has kept and performed all the terms of the contract by him to be kept or performed, and therefore the defense of a want of mutuality is not available. In *Burnell* v. *Bradbury,* 67 Kan. 762, 74 Pac. 279, respecting this doctrine, it is said: "It is well settled that, where a contract has been fully performed by one party, want of mutuality cannot be set up by the other as a defense to an action for specific performance. There is no room for the party in default to say that he could not enforce performance for want of mutuality. There is nothing left to be done by anyone but himself. The want of mutuality has no application in an action for specific performance where it is shown that the party seeking relief has fully performed all the conditions of the contract." (2 Beach on Contracts, sec. 889; *Newell's Appeal,* 100 Pa. St. 513; *Bigler* v. *Baker,* 40 Neb. 325, 58 N. W. 1026, 24 L. R. A. 255; *Grove* v. *Hodges,* 55 Pa. St. 504; *Lindsay* v. *Warnock,* 93 Ga. 619, 21 S. E. 127.)

11. Criticism is made as to the character and extent of Heinze's possession of the claim from December 23d to February 24th, and as to the amount expended by him in improving the property. It is said that his possession was not of that exclusive character necessary to entitle him to specific performance, and, as evidence of this, attention is directed to the fact that during such period Wishon, Finlen's foreman, visited the mine four or five times, and at one time, at least, directed Mahoney's attention to the condition of the shaft. But Wishon's testimony is that he had nothing whatever to do with employing or discharging or directing the men, or with the mining operations; and considering that, according to Heinze's,

own version, until the options were actually taken up, Finlen had at least a contingent interest in the property, there is nothing in Wishon's visits to the mine inconsistent with Heinze's exclusive possession of it.

It appears from the testimony of Carnochan, Heinze's bookkeeper, that during December Heinze paid out on account of work done and materials furnished by him at the mine $202.19; in January, $475.72; and from February 1st to 24th, $3,-664.27. This, of course, is in addition to the amount paid out by Finlen under the agreement between MacGinniss and Wishon, and which was to be repaid to Finlen under Heinze's version of the transaction, at least. The amount and character of the work are shown by the testimony of McFarlane and Mahoney, and the returns from the smelter. The work consisted in cleaning out the mine, which had practically been abandoned, and replacing the tracks, air pipes, and other appliances, in repairing machinery already in the mine, in running drifts and cross-cuts in the mine, and in discovering bodies of valuable ore, and mining and smelting the same. Considering the fact that Finlen had spent a not inconsiderable fortune in attempting to discover ore in paying quantities, and had altogether failed, and that he had become discouraged, and had taken out the mining appliances, and, as a number of witnesses say, had declared his intention not to spend any more money on the property, he is hardly in a position to criticise the operations of some one else, who, as the evidence shows, in two or three weeks after taking possession of the property had uncovered ore bodies of sufficient size and value to make it possible for Finlen to recover the $54,000 which he. had all but lost.

12. Finally, it is said that the counterclaim is insufficient. It is said that Heinze does not offer to do equity: First, that he does not specifically offer to pay the $54,000; and, second, while he specifies the time of making the payments as one and two years, respectively, after he should take up the leases and bonds, he nowhere states when he actually took them up.

1. The allegation in the counterclaim is that Heinze has kept and performed all the conditions of the agreement by him to be kept or performed, and that he was at the time of the filing of this counterclaim, and ever since the 21st day of November, 1898, has been, able, willing, and ready to comply with all the conditions thereof, and that he offers and binds himself that if the court shall decree him to be the owner of Finlen's interest, or, in other words, shall decree a specific performance of the contract as claimed by him, he will then pay to the plaintiff the sum of $54,000, and, in addition thereto, pay the plaintiff whatever sum he paid for the Kelly interest, for which it appears Finlen has in the meantime procured a deed.

In *Christiansen* v. *Aldrich,* 30 Mont. 446, 76 Pac. 1007, this court said: "It is said that the complaint is defective for failing to show a tender of the balance of the purchase money before the action was brought. It is undoubtedly the general rule that, if a part of the purchase price is still due and payable, the plaintiff seeking to have the conveyance compelled must allege and prove a tender of it, and bring it into court. But the rule is not invariable. An exception to it is where it is apparent from the pleading that a tender would be useless. 'Where the vendor claims to have rescinded, repudiates, and denies the obligation of the contract, placing himself in such a position that it appears that, if the tender were made, its acceptance would be refused, then no tender need be made by the vendee. * * * In such case it is enough if the plaintiff offer by his bill to bring in the money when the amount is liquidated and he has his decree for the performance.' " And numerous authorities in support of this doctrine are there collated. If this decision announces the correct rule—and we are satisfied that it does—then it is apparent that the counterclaim contains all the necessary allegations, and is not open to the criticism directed against it.

2. As to when Heinze actually took up the leases and bonds is quite immaterial, except upon a theory suggested by counsel

for appellant—that, if the decree herein is to be enforced, each of the payments of $27,000 should bear interest from one and two years after such date. And on the cross-examination of defendant Heinze he was asked to give that date, but upon objection the testimony was excluded and an exception taken, but no error is assigned in appellant's brief to this ruling of the court; neither is there any specific objection to the form of the decree in this respect. However, aside from these considerations, we are of the opinion that the court did not err in excluding the evidence. Section 4280 of the Civil Code reads as follows: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt."

As applied to this case, then, that section means that Finlen is entitled to interest on each of those payments except during such time as he himself prevented Heinze from making then . If Heinze had deposited the amounts in court at the time of filing his counterclaim, no one would insist that he must now pay interest on them; and under the authority of *Christiansen* v. *Aldrich, supra,* he was not required to make such deposit or tender, for the reason that, as Finlen denied the existence of the contract, such deposit or tender would have been useless. Not only did Finlen deny that any contract whatever was made, but he took the initiative, and commenced this action to recover possession of the property in controversy. So far as this record shows, the only thing which interposed and prevented Heinze from making these payments when they became due was Finlen's own acts, and these bring the case within section 4280, above. This interference on Finlen's part arose before either payment became due, and continued until the trial, so that now, having prevented such payments being made on time, he cannot ask interest by way of damages or compensation for the delay which he himself occasioned.

The judgment and order appealed from are affirmed.

*Affirmed.*

MR. JUSTICE MILBURN concurs.

MR. CHIEF JUSTICE BRANTLY: I do not agree with all that is said in the majority opinion, nor do I concur in the result reached.

Under the Act of 1903 (Second Extraordinary Session of 1903, page 7, chapter 1), I think the rule to be that this court may not disturb the findings of the district court unless the evidence preponderates against them. (*Bordeaux* v. *Bordeaux,* 32 Mont. 159, 80 Pac. 6.) This view is supported by the weight of authority and reason, because, under the procedure which must be observed touching the taking of evidence by the trial court, and its reproduction in this court, we cannot on review have the advantage of seeing the witnesses and observing their manner while testifying. These are important elements, which this court cannot consider and weigh. In those states in which the evidence in equity cases is all presented in the form of depositions, these important elements of proof are not before the trial court. Therefore the appellate court can just as well try the case *de novo* and reach an independent conclusion. Under the statute the power of this court is limited merely to review. The findings of the trial court must therefore be treated as *prima facie* correct, at least.

I assume, also, for the purposes of this case, the proposition that a preponderance of evidence is sufficient to support a finding of any fact in a civil case. But these propositions do not conflict with another, especially applicable to cases for specific performance of parol contracts; that all the terms and conditions of the particular contract must be established by the evidence clearly and definitely, and if any of them are left in doubt or uncertainty, or if any part of the contract as set out, as a whole, still rests in treaty and requires further negotiation, it will not be specifically enforced.

It seems to me that the evidence adduced in this case goes beyond the allegations of the defendant's counterclaim, and tends to establish a different contract from that alleged in the pleadings and found by the court. The contract alleged and found is, in brief, that Finlen agreed to assign the bonds and leases to the defendant, and to bring and prosecute the action at defendant's expense, but in his own name, retaining possession for this purpose until the defendant should desire to assume it; that the defendant should pay all the expenses of developing the property, and should, after suit brought, assume the exclusive possession of it, and thereafter observe the covenants and agreements contained in the leases and bonds; that if the property proved valuable, and the defendant should take up the options from the lessors, he would be bound to pay to the plaintiff the sum of $54,000—one-half within one year from the date of the purchase, and one-half within two years. The development of the property and the purchase by the defendant from the lessors is the part performance relied on as the ground for a specific performance. On November 21, 1898, when it is claimed that the contract was made, about the time the parties separated a difficulty was suggested as to the disposition to be made of the expense to be incurred in looking after the property pending the actual taking possession by the defendant, and compensation for certain supplies on the premises. It was then agreed that the plaintiff should pay all the expenses until possession should be taken, and that he should be reimbursed therefor by the defendant. The supplies left on the property should be paid for by the defendant in the same way. Such expenses as were incurred were paid by the plaintiff, and his supplies were used. Even after possession was taken by the defendant, bills for wages and supplies were paid by the plaintiff to the amount of between two and three thousand dollars. This agreement is not alleged as a part of the contract, and the court, in its findings, disposed of it by finding that it was an independent agreement, made for convenience, and not a part of the contract. The decree makes no provision for the

reimbursement of the plaintiff. The finding of the court is based upon the testimony of defendant's witnesses who were present at the time, and who stated, by way of conclusion, that this agreement was no part of the contract. To my mind, however, the circumstances and the nature of the contract were such that this compact was necessarily a part of it, for the reason that the contract could not have been carried out without some such arrangement. Even in the absence of such an express provision, it would, it seems, have been implied from the very nature of the case. But whether it would have been implied or not, I think the only finding possible under the evidence is that this was one of the provisions of the contract. Not only this, but the payments for supplies and wages after actual possession was taken were but a continuance of this arrangement originally made, in order to bear out the impression that the property was still Finlen's, and that the action brought by him was actually his. According to one of the witnesses, the retention of possession by Finlen for the time being, and the bringing of the suit in his name, was for strategical reasons; and as this feature entered into the contract, and the property had to be cared for in the meantime, it certainly follows that some one was to pay this expense, and, since it was agreed that Finlen should do so, it necessarily follows that this was an element of the contract to be taken into consideration in adjusting the rights between the parties. Otherwise there is no reasonable explanation of the behavior of the parties from the time it is alleged the contract was entered into until the defendant took possession on the 23d of December. Whether this condition of the evidence be denominated a technical variance or a failure of proof (section 772, Code of Civil Procedure), I think it fatal to the decree.

Furthermore, I think the decree should, in any event, be so amended as to require the defendant to pay interest upon the installments of the purchase price from the time at which they respectively fell due, and that for the purpose of fixing these dates the cause should be remanded for further proof. The

·defendant has asked that the contract be specifically enforced as made.   Conceding that it was made as alleged and found, the decree should adjust the matter of interest.   I do not think the section of the statute cited in the majority opinion has any ·application.

These views may seem somewhat technical, but an action for specific performance of a parol contract proceeds and must be ·sustained, if at all, upon grounds which are more or less techni·cal.

Rehearing denied June '3, 1905.